**Betty J. SCHAEFER, Executrix of the Estate of William Schaefer, Plaintiff–Appellant,**

v.

**TOWN OF VICTOR, Village of Victor, Hartman Material Handling Systems, Inc., R. Phillip Hartman, Mendon Disposal Co., Inc. and Waste Management of New Jersey, Inc., Defendants–Appellees.**

**Docket No. 05–1949–CV.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 19, 2005.

Decided: July 13, 2006.

Alan J. Knauf, Knauf Shaw LLP, Rochester, NY, for Plaintiff–Appellant.

Michael R. Wolford, Wolford & Leclair LLP, Rochester, N.Y. (Leslie E. Swift, Wolford & Leclair LLP, Rochester, NY, and Michael A. Jones, Jr., Town of Victor, NY, on the brief), for Defendants–Appellees Town of Victor and Village of Victor.

Before: OAKES, SOTOMAYOR and WESLEY, Circuit Judges.

WESLEY, Circuit Judge:

A perceptive governor once noted: "Benjamin Franklin said there were only two things certain in life: death and taxes. But I'd like to add a third certainty: trash."[1] The instant case arises out of the federal government's efforts to deal with this "third certainty" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), §§ 101–175, 42 U.S.C. §§ 9601–9675 (2000). Congress enacted CERCLA to address the risks associated with the improper storage and disposal of hazardous and toxic substances. To minimize these risks, "Congress established a fund to finance cleanup of some sites and required certain responsible parties to reimburse either the fund or the parties who paid for the cleanup." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 506, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

CERCLA's passage ignited controversy over whether responsible persons could seek contribution for cleanup costs from other responsible parties. To address this uncertainty, Congress added an explicit right of contribution, CERCLA § 113(f)(1), in the Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613, 1647–48 (1986). The Supreme Court recently clarified, however, that a potentially responsible party may seek contribution under § 113(f)(1) only if the party has already been sued under CERCLA. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 165–66, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004).

The threshold issue in the instant case is whether a potentially responsible party that may not seek contribution under § 113(f)(1) may nevertheless recover in indemnity under another section of CERCLA— § 107(a)—and, if so, whether plaintiff William Schaefer initiated this action within the applicable statute of limitations. We hold that, while this Circuit's most recent view of the statute allows Schaefer to bring this claim as a cost recovery action under § 107(a), Schaefer failed to initiate this action for remedial costs within the applicable limitations period. In so holding, we reject Schaefer's recommendation that we adopt a "bright-line" rule based either on the ultimate approval of a remedial action plan or on the closure of the landfill. We conclude that the limitations period for remedial actions begins, as the plain language of the statute instructs, from the "initiation of physical on-site construction of the remedial action." CERCLA § 113(g)(2)(B).

## BACKGROUND

Over four decades ago, William Schaefer opened the Genesee Sand & Gravel Landfill (the "landfill") in Ontario County in western New York. In 1965, Schaefer contracted with the Town of Victor (the "Town") to operate the landfill. The landfill operated continuously between 1965 and April 1993, during which time Schaefer accepted waste from several of the defendants. For example, Schaefer contracted with the Town of Victor to provide landfill services for the Town between July

1. Governor Ruth Ann Minner, 2005 State of the State Address, *available at* http://www.stat e.de.us/governo r/speeches/.

1, 1968 and November 9, 1981. The Town, in turn, gave permission to defendant Hartman Material Handling Systems, Inc. ("Hartman Material"), a now dissolved New York corporation then managed by defendant Philip Hartman ("Hartman"), to dispose of waste at the landfill. Schaefer also entered into multiple agreements with the Village of Victor (the "Village") to dispose of solid waste between 1968 and 1993. Additionally, defendant Mendon Disposal Co., Inc. ("Mendon Disposal"), another dissolved New York corporation, which was the predecessor of defendant Waste Management of New Jersey, Inc. ("Waste Management"), allegedly deposited solid waste at the landfill.

Schaefer's environmental troubles began in the early 1980s when he attempted to renew his landfill operating permit with the New York State Department of Environmental Conservation ("DEC"). The DEC had issued Schaefer a permit in 1978 allowing him to operate the landfill until October 1, 1981. In September of 1981, Schaefer submitted an application for renewal of this permit and, over the next several years, Schaefer and the DEC negotiated the terms of the pending permit renewal.

The DEC later advised Schaefer that his renewal application was deficient. Specifically, the DEC discovered that Schaefer's landfill was located over a principal aquifer (an underground bed of earth, gravel, and porous stone that yields groundwater). Concerned over potential groundwater contamination, the DEC notified Schaefer that the landfill would have to be closed unless it could be "conclusively demonstrated" that Schaefer's proposal to continue operating the landfill "minimizes or avoids adverse environmental effects to the maximum extent practicable." Although the DEC recommended closure of the facility in an environmentally sound

manner as the "most cost-effective solution," it nevertheless gave Schaefer the option of closing the site or undertaking the "additional work necessary to develop a complete application."

It was later discovered, however, that the landfill's solid waste actually included certain hazardous substances as defined by CERCLA. See CERCLA § 101(14), 42 U.S.C. § 9601(14) (defining hazardous substances). Specifically, hazardous substances were detected in leachate (i.e., liquid that has percolated through the soil) and in groundwater monitoring wells at the landfill. In addition, Hartman Material informed the DEC that it had generated "waste paint, filter (dried) and flammable liquids," which had been disposed at Schaefer's landfill between 1966 and 1981. As a result, the DEC designated the landfill as a "suspected" site on the New York State Registry of Inactive Hazardous Waste Disposal Sites ("Registry"). Later in 1986, the DEC denied Schaefer's pending renewal application and directed Schaefer to close the landfill no later than October 31, 1986. Schaefer did not close the landfill; instead, while seeking a permit renewal, he continued to operate the landfill without a permit.

The DEC informed Schaefer on March 5, 1990, that he was responsible for investigative and/or remedial activities (i.e., permanent containment efforts) at the landfill, pursuant to both CERCLA § 107(a) and the New York Environmental Conservation Law (ECL) § 27–1313. Later that year, Schaefer entered into a Consent Order (the "1990 Consent Order") with the DEC for investigation (but not remediation) of the landfill. To this end, Schaefer hired Dunn Geoscience to conduct several studies in response to the threats posed by the landfill. The studies showed that, while there had been no proven release of hazardous wastes as defined by federal law

and the ECL, there had been releases of hazardous substances as defined by CERCLA. *See* CERCLA § 101(14).

Because Schaefer still had not closed his landfill, the DEC finally brought an administrative complaint against Schaefer on November 1, 1991. The DEC alleged that Schaefer was illegally operating the landfill without a valid permit and in violation of operational requirements. In January of 1992, Schaefer and the DEC resolved the allegations in the administrative complaint through another Consent Order (the "1992 Consent Order"). Pursuant to this Order, Schaefer agreed to close the landfill in an environmentally sound manner and to provide post-closure care of the landfill. The 1992 Consent Order further provided for the assessment of civil monetary penalties against Schaefer and required Schaefer to submit a closure plan within 60 days. However, the agreement also allowed Schaefer to continue operating the landfill until November 30, 1992.

Schaefer and the DEC later entered into three orders of modification, which altered various aspects of the 1992 Consent Order. On November 25, 1992, Schaefer and the DEC entered into the first "Order of Modification," which allowed Schaefer to continue operating the landfill until December 30, 1992. On December 30, 1992, Schaefer and the DEC entered into a "Second Order of Modification," which permitted Schaefer to operate the landfill until April 30, 1993, gave Schaefer until the end of January 1993 to submit a closure plan, and created a surety agreement to ensure proper closure of the landfill. The surety agreement was subsequently modified on January 13, 1993, when Schaefer and the DEC entered into a "Third Order of Modification," which required Schaefer to submit an acceptable surety to the DEC by March 1, 1993.

On January 10, 1993, Schaefer and the DEC entered into a separate "Closure Implementation Agreement," which established procedures for Schaefer to notify the DEC of work he had completed in closing the landfill and to request reimbursement. On January 11, 1993, Schaefer entered into a trust agreement with Canandaigua National Bank for financing the closing of the landfill. On January 13, 1993, Schaefer and the DEC also entered into a stipulation acknowledging the landfill's removal from New York's Registry of Inactive Hazardous Waste Disposal Sites. The stipulation was based on a DEC letter, dated December 16, 1992, which informed Schaefer that his landfill was being deleted from the Registry because the agency had not identified any hazardous wastes at his site. That stipulation was converted to an Order of the New York Supreme Court on January 27, 1993.

Schaefer continued to operate the landfill during the first four months of 1993. Schaefer contends that he ceased operating the landfill and began its permanent closure on April 30, 1993—the date on which he was no longer permitted to operate the landfill. On June 4, 1993, more than four months after the deadline for submitting a closure/post-closure plan, Schaefer submitted (but the DEC rejected) a closure/post-closure plan prepared by Lozier Engineers and Mr. Timothy Rock. On August 6, 1993, Schaefer submitted (and the DEC approved) a revised closure/post-closure plan. The revised closure/post-closure plan indicated that the landfill would be closed in accordance with both the plan itself and the 1992 Consent Order and that the landfill would be monitored for thirty years with annual reports submitted to the DEC.

In October of 1993, nearly six months after permanent closure of the landfill began and more than two months after the

DEC's approval of Schaefer's revised closure/post-closure plan, Schaefer commenced a proceeding in state court against the DEC. In the proceeding, captioned *Schaefer v. DEC*, Schaefer sought, among other things: (i) payments from the trust fund for closure of the landfill; (ii) nullification of the 1992 Consent Order and orders of modification; and (iii) authorization to resume operating the landfill.

On March 11, 1994, the New York Supreme Court (Harvey, J.) denied Schaefer's application (the "Consent Judgment"). The court found that Schaefer violated the Third Order of Modification by failing to establish by March 1, 1993, an acceptable surety for the full costs of closing the landfill. The court noted that the amount Schaefer had deposited was "far short of the 1.253 million [dollar] estimated cost of completion." The court concluded that the DEC was justified in refusing to release funds to Schaefer because "doing so would reduce the fund below the amount necessary to insure completion of the closure." The court also emphasized that there is "certainly no basis for allowing [Schaefer] to reopen and resume operation of the landfill." Schaefer appealed and, in 1995, while his appeal was pending, Schaefer completed permanent closure of the landfill. Subsequently, on April 23, 1996, Schaefer and the DEC entered into a "Stipulation and Settlement Agreement," which formally discontinued Schaefer's appeal of the Consent Judgment.

On January 13, 1999, Schaefer commenced this action against defendants including the Town of Victor and the Village of Victor (collectively, "Victor"). Schaefer sought contribution under CERCLA § 113(f)(1) and contribution, indemnification, and unjust enrichment under New York state law. Schaefer's CERCLA claim alleged that he had incurred substantial response costs recoverable pursuant to § 107(a) and that, pursuant to § 113(f)(1), defendants should contribute to him their equitable share of his past and future response costs at the landfill, including the costs of investigation, closure, and post-closure activities. On November 28, 2003, defendants moved for summary judgment to dismiss Schaefer's claims as time-barred under the relevant statutes of limitations or, in the alternative, as without merit. On December 5, 2003, Schaefer[2] moved for partial summary on the liability portion of the CERCLA contribution claim.

The United States District Court for the Western District of New York (Feldman, M.J.) 18 granted defendants' motions for summary judgment.[3] The court concluded that Schaefer's § 113(f)(1) contribution action failed to meet the applicable statutes of limitations for two independent reasons. *See Scharfer v. Town of Victory*, No. 99–CV–6010, 2004 WL 2123605 (W.D.N.Y. Sept.23, 2004). First, the magistrate judge held that the entry of the Consent Judgment in 1994 constituted a "judicially approved settlement" under CERCLA § 113(g)(3) and thus triggered a three-year statute of limitations within which Schaefer failed to file a claim. *See id.* at *3. Second, the magistrate judge held that, even assuming that no triggering event had occurred, the relevant statute of limitations could be "borrowed" from § 113(g)(2). *See id.* at *4. Under

---

**2.** Betty Schaefer continued the action as executrix of the estate of her deceased husband, William Schaefer. For ease of reading, we will continue to refer to plaintiff as "Schaefer."

**3.** Upon consent of the parties, a magistrate judge "may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case." 28 U.S.C. § 636(c)(1).

§ 113(g)(2), the magistrate judge found that this case involved a remedial action (with a limitations period of six years) rather than a removal action (with a limitations period of three years) because Schaefer's actions were "clearly intended to effectuate a long-term, indeed permanent, remedy: the actual closure of the landfill," *id.* at *5, rather than "short-term abatement activities," *id.* at *4. The court then found that "it is clear that remedial activity began long before January 1993." *Id.* at *5. As a result, the court concluded that Schaefer's suit, which had been initiated on January 13, 1999, was not within six years of the initiation of remedial action and therefore was untimely. Schaefer timely appealed.

## DISCUSSION

### I. CERCLA's Statutory Framework

■ CERCLA establishes "a regime of broad-ranging liability, permitting the government to recover its remediation expenses directly from parties responsible for pollution and authorizing private parties to pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats." *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 326 (2d Cir.2000) (citations omitted). In three separate provisions, CERCLA authorizes parties "to recoup money spent to clean up and prevent future pollution at contaminated sites or to reimburse others for cleanup and prevention at contaminated sites." *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir.2005). Specifically, CERCLA permits cost recovery actions under § 107(a) by the government and certain private parties against potentially responsible parties; contribution actions under § 113(f)(1) for parties who have been sued under § 106 or § 107; and contribution actions under § 113(f)(3)(B) for parties that have entered an administrative or judicially approved settlement with the United States or a state.

Under CERCLA, the federal government "may clean up a contaminated area itself," under § 104,[4] or it "may compel responsible parties to perform the cleanup," under § 106(a).[5] *Cooper Indus., Inc.,*

---

4. CERCLA provides:

Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment....

CERCLA § 104(a)(1), 42 U.S.C. § 9604(a)(1).

5. The statute provides:

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

CERCLA § 106(a), 42 U.S.C. § 9606(a).

543 U.S. at 161, 125 S.Ct. 577 (citing *Key Tronic Corp. v. United States,* 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994)). In either case, the government may recover response costs under § 107 for removal and remedial actions. 42 U.S.C. § 9607. Section 107(a) enumerates four classes of potentially responsible parties ("PRPs"): (1) owners of facilities with hazardous substances; (2) former owners of facilities with hazardous substances; (3) generators of hazardous substances; and (4) transporters of hazardous substances. *Id.* § 9607(a)(1)-(4). These four classes of PRPs "shall be liable" for, among other things, "all costs of removal or remedial action incurred by the United States government . . . not inconsistent with the national contingency plan."[6] *Id.* § 9607(a)(4)(A).

Section 107 also provides "a cause of action for private parties to seek recovery of cleanup costs," *Key Tronic Corp.,* 511 U.S. at 818, 114 S.Ct. 1960, because PRPs are liable for "any other necessary costs of response incurred by *any other person* consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B) (empha-

sis added). Under § 107(a), the government or a private party can "sue for full recovery of its costs, *i.e.,* indemnity," *Bedford Affiliates v. Sills,* 156 F.3d 416, 424 (2d Cir.1998), and, "[w]here the environmental harm is indivisible, multiple responsible persons will be jointly and severally liable for cleanup costs," *id.* at 423 (citing *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir.1992)).

For cost recovery actions under § 107, CERCLA "distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements."[7] *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1040 (2d Cir.1985) (footnotes omitted). The statute of limitations for the recovery of costs related to "removal actions" is three years after the completion of the removal action, CERCLA § 113(g)(2)(A), while the limitations period for the recovery of costs related to "remedial actions" is six years after the initiation of physical on-site construction of the remediation, *id.* § 113(g)(2)(B).[8] Be-

---

**6.** The national contingency plan, codified at 40 C.F.R. pt. 300 (2004), "specifies procedures for preparing and responding to contaminations and was promulgated by the Environmental Protection Agency (EPA) pursuant to CERCLA § 105, 42 U.S.C. § 9605." *Cooper Indus.,* 543 U.S. at 161 n. 2, 125 S.Ct. 577.

**7.** Removal actions include "the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release." CERCLA

§ 101(23), 42 U.S.C. § 9601(23). Remedial actions, on the other hand, are "those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. . . ." *Id.* § 101(24), 42 U.S.C. § 9601(24).

**8.** CERCLA provides that:

An initial action for recovery of the costs referred to in [§ 107] of this title must be commenced—

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under

cause of this difference in limitations periods, whether an activity is a "removal action" or a "remedial action" under § 107(a) can be determinative of the timeliness of a claim. Here, however, Schaefer and Victor both concede that the primary controversy in this case involves a remedial action. Thus, if CERCLA allows Schaefer to bring an action under § 107(a), the applicable statute of limitations would be six years. *See id.* § 113(g)(2)(B).

After Congress enacted CERCLA in 1980, litigation ensued over "whether § 107, in addition to allowing the Government and certain private parties to recover costs from PRPs, also allowed a PRP that had incurred response costs to recover costs from other PRPs." *Cooper Indus.,* 543 U.S. at 161, 125 S.Ct. 577. In particular, the issue was "whether a private party that had incurred response costs, but that had done so voluntarily and was not itself subject to suit, had a cause of action for cost recovery against other PRPs." *Id.* At the time, "[v]arioso courts held that § 107(a)(4)(B) and its predecessors authorized such a cause of action." *Id.* (citations omitted).

Litigation also arose over "the separate question whether a private entity that had been sued in a cost recovery action (by the Government or by another PRP) could obtain contribution from other PRPs." *Id.* at 162, 125 S.Ct. 577. Originally, "CERCLA lacked a specific provision permitting a potentially responsible person that had incurred cleanup costs to seek contribution

from other liable parties." *Bedford Affiliates,* 156 F.3d at 423. Nonetheless, several district courts held that, "although CERCLA did not mention the word 'contribution,' such a right arose either impliedly from provisions of the statute, or as a matter of federal common law." *Cooper Indus.,* 543 U.S. at 162, 125 S.Ct. 577 (collecting cases). The Supreme Court has since characterized this conclusion as "debatable" in light of *Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638–47, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981), and *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 90–99, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)—two decisions in which the Court "refused to recognize implied or common-law rights to contribution in other federal statutes." *Cooper Indus.,* 543 U.S. at 162, 125 S.Ct. 577.

In any event, "Congress subsequently amended CERCLA in the Superfund Amendments and Reauthorization Act of 1986 (SACRA), 100 Stat. 1613, to provide an express cause of action for contribution, codified as CERCLA § 113(f)(1)." *Id.* As a result, and as noted above, CERCLA now provides for contribution actions under § 113(f)(1), as well as cost recovery actions under § 107(a). Specifically, under § 113(f)(1), a party who is liable or potentially liable under § 107(a) and who has been sued under § 106 or § 107(a) may seek contribution under § 113(f)(1). *See* 42 U.S.C. § 9613(f)(1).[9] The statute of

---

[§ 104(c)(1)(C) ] of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

9. The subsection provides:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title [CERCLA § 106] or under section 9607(a) of this title [CERCLA § 107(a) ]. Such claims shall be

limitations for contribution claims under § 113(f)(1) is three years. *See* 42 U.S.C. § 9613(g)(3). Thus, if Schaefer were able to bring a contribution claim under § 113(f)(1), the applicable statute of limitations would be three years.[10]

## II. Cause of Action under CERCLA

■ Under this Circuit's view of the statute at the time Schaefer filed this action, a PRP that had incurred cleanup costs could seek contribution under § 113(f)(1) even if the PRP had not been sued in a cost recovery action under § 106 or § 107(a). As discussed below, that view has changed, and Schaefer concedes on appeal that she cannot maintain a contribution claim under § 113(f)(1) because Schaefer has not been sued in a civil action as specified in that section.[11] Schaefer now asserts, however, that she may bring an action under § 107 for response costs incurred during remediation of the landfill and that this § 107 claim is timely.[12] Determining whether Schaefer may bring this claim under § 107(a), however, re-

quires a careful examination of several recent cases.

In *Bedford Affiliates v. Sills*, we held that, under CERCLA, PRPs are limited to actions for contribution. 156 F.3d 416, 424 (2d Cir.1998). In that case, Bedford Affiliates, a property owner, brought a CERCLA action seeking recovery of cleanup costs and contribution from former lessees and a sublessee, Sills, who had previously operated a dry cleaning business on Bedford's property. The district court concluded that Bedford could not pursue a cost recovery claim under CERCLA § 107(a), but that Bedford could pursue a contribution claim under CERCLA § 113(f)(1). Accordingly, the district court proceeded to apportion liability for remediation costs under § 113(f)(1). The court found that, while Sills was 95% liable, Bedford was 5% responsible for the costs. *Id.* at 422.

On appeal, we affirmed the district court's determination that Bedford could not pursue a cost recovery claim under § 107(a). We recognized the distinction between indemnification (total reimburse-

---

brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title [CERCLA § 106] or section 9607 of this title [CERCLA § 107].

CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).

10. CERCLA § 113(f)(3)(B) allows contribution actions for parties that have entered an administrative or judicially approved settlement with the United States or a state. *See* 42 U.S.C. § 9613(f)(3)(B). For reasons that follow, § 113(f)(3)(B) is unnecessary for our disposition of this case. *See infra* note 19.

11. As discussed below, the Supreme Court in *Cooper Industries* held that a PRP who had not been involved in a CERCLA administrative or cost recovery action could not obtain contribution under CERCLA § 113(f)(1) from other liable parties. *See Cooper Indus.*, 543 U.S. at 166, 125 S.Ct. 577; *see also Syms v. Olin Corp.*, 408 F.3d 95, 101 (2d Cir.2005) (holding that a party who has not been sued under § 106 or § 107 is ineligible to seek contribution under § 113(f)(1)); *cf. Consol. Edison*, 423 F.3d at 95 (noting that "Con Ed effectively concedes that, in the wake of *Cooper Industries*, it cannot bring its suit under section 113(f)(1) because it has not been sued in a civil action as specified in that section").

12. Schaefer argues as well that she is entitled to response costs for a removal action, which she contends was completed fewer than three years before the initiation of remedial action and thus is also timely under CERCLA § 113(g)(2)(B).

ment for costs incurred by an innocent party) under § 107 and contribution (the right to recover from other responsible parties for their pro rata share of the total liability) under § 113(f)(1). *See Bedford Affiliates,* 156 F.3d at 424. We concluded that "[t]he language of CERCLA suggests Congress planned that an *innocent* party be able to sue for *full* recovery of its costs, *i.e.,* indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its pro rata share of the entire cleanup expenditure, *i.e.,* contribution under § 113(f)(1)." *Id.* (emphasis added). We also noted that, in contrast to § 113(f)(1), which has a three-year statute of limitations, *see* § 113(g)(3), § 107(a) has a six-year statute of limitations, *see* § 113(g)(2). *Id.* We emphasized that, "[w]ere we to permit a potentially responsible person to elect recovery under either § 107(a) or § 113(f)(1), § 113(f)(1) would be rendered meaningless" because "[a] recovering liable party would readily abandon a § 113(f)(1) suit in favor of the substantially more generous provisions of § 107(a)." *Id.*

Six years later, in *Cooper Industries, Inc. v. Aviall Services, Inc.,* the Supreme Court held that a PRP who had paid cleanup costs but had not done so in the context of a CERCLA administrative or cost recovery action could not obtain contribution under CERCLA § 113(f)(1) from other liable parties. 543 U.S. 157, 165–66, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004). Avail Services, which had operated four contaminated aircraft engine maintenance sites in Texas, and was thus a PRP under

§ 107(a), claimed that it was entitled to seek contribution, pursuant to § 113(f)(1), from Cooper Industries, the owner of the sites. The Supreme Court held that § 113(f)(1) does not authorize a contribution claim by a PRP unless that PRP has been sued under either § 106 or § 107. The Court determined that the natural meaning of the first sentence of § 113(f)(1) is that "contribution may only be sought subject to the specified conditions, namely, 'during or following' a specified civil action." *Cooper Indus.,* 543 U.S. at 166, 125 S.Ct. 577 (quoting 42 U.S.C. § 9613(f)(1)). The Court noted that, "if § 113(f)(1) were read to authorize contribution actions at any time, regardless of the existence of a § 106 or § 107(a) civil action, then Congress need not have included the explicit 'during or following' condition." [13] *Id.*

However, in *Cooper Industries,* the Supreme Court declined to address the open question of whether a private party that is itself a PRP may pursue a § 107(a) action against other PRPs for joint and several liability. *See id.* at 169, 125 S.Ct. 577. The Court noted numerous decisions, including *Bedford Affiliates,* holding that a PRP may not bring a cost recovery action under § 107(a); yet, the Court concluded that to decide the issue it "would have to consider whether these decisions are correct, an issue that [Avail Services] has flagged but not briefed." *Id.* The Court also declined to address the related issue of whether a plaintiff, who seeks to recover the share of its cleanup costs fairly chargeable to another PRP, "may pursue a § 107

---

**13.** *In Cooper Industries,* neither the state environmental commission nor the EPA took judicial or administrative measures to compel the cleanup. *See Cooper Indus.,* 543 U.S. at 167, 125 S.Ct. 577. In holding that § 113(f)(1) does not authorize a contribution claim by a PRP who has not been sued under § 106 or § 107, the Court also noted that, "if § 113(f)(1) authorizes contribution actions at any time, § 113(f)(3)(B), which permits contribution actions after settlement, is equally superfluous." *Id.* at 166, 125 S.Ct. 577. The Court pointed out that "[t]here is no reason why Congress would bother to specify conditions under which a person may bring a contribution claim, and at the same time allow contribution actions absent those conditions." *Id.*

cost recovery action for some form of liability other than joint and several." *Id.* at 169–70, 125 S.Ct. 577. Finally, the Court declined to address the issue of whether a PRP might have an implied right to contribution under § 107. *See id.* at 170–71, 125 S.Ct. 577.

Less than one year later, we confronted one of the issues left open in *Cooper Industries:* does a PRP who has not been sued under § 106 or § 107 have a cause of action[14] under CERCLA? *See Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.,* 423 F.3d 90, 92 (2d Cir.2005). Prior to entering into a "Voluntary Cleanup Agreement" with the DEC, Consolidated Edition ("Con Ed") sued AUG, a manufactured gas plant operator, seeking to recoup the costs that Con Ed had incurred, and would incur, in cleaning up contaminated sites. *See id.* at 93. After determining that § 113(f)(3)(B) did not provide Con Ed with a cause of action because an administrative settlement between Con Ed and the DEC did not resolve CERCLA liability, *see id.* at 95–97, we considered whether Con Ed could bring its suit under either § 107(a) or § 113(f)(1). We held that, although the Supreme Court's holding in *Cooper Industries* prohibits a PRP who has not been sued from seeking contribution under § 113(f)(1), such a PRP could still recover under § 107(a) for "necessary response costs incurred voluntarily, not under a court or administrative order or judgment." *Id.* at 100. We reasoned:

> Given that section 107(a) is distinct and independent from section 113(f)(1), and that section 113(f)(1)'s remedies are not available to a person in the absence of a civil action as specified in that section, determining whether a party in Con Ed's circumstances [that is, a PRP who has not been sued but who has voluntarily incurred response costs] may sue under section 107(a) is easily resolved based on that section's plain language. Section 107(a) makes parties liable for the government's remedial and removal costs and for "any other necessary costs of response incurred by any other person consistent with the national contingency plan."

*Consol. Edison,* 423 F.3d at 99 (quoting § 107(a)). We concluded that Con Ed could bring suit under § 107(a) for indemnification because, "in light of *Cooper Industries,* Con Ed's costs to clean up the sites ... are 'costs of response' within the meaning of that section."[15] *Id.* at 97.

---

**14.** In *Consolidated Edison,* a panel of this Court framed the question as whether "subject matter jurisdiction" exists under § 107(a). 423 F.3d at 97. Subject matter jurisdiction, however, only requires a plaintiff to have a "colorable claim" arising under the Constitution or laws of the United States. *Da Silva v. Kinsho Int'l Corp.,* 229 F.3d 358, 363 (2d Cir.2000) (citing *Bell v. Hood,* 327 U.S. 678, 681–85, 66 S.Ct. 773, 90 L.Ed. 939 (1946)). We believe that the type of question at issue in *Consolidated Edison,* as well as in the instant case, is phrased more appropriately as whether the plaintiff has a "cause of action" under the statute. *See Bell,* 327 U.S. at 682, 66 S.Ct. 773.

**15.** The Court in *Consolidated Edison,* perhaps reading between the lines of dicta in *Cooper Industries,* only addressed the possibility of a cost recovery (and not a contribution) action under CERCLA § 107(a). *Cf. Cooper Indus.,* 543 U.S. at 170–71, 125 S.Ct. 577 ("To the extent that [a plaintiff] chooses to frame its § 107 claim on remand as an implied right of contribution (as opposed to a right of cost recovery), we note that this Court has visited the subject of implied rights of contribution before.") (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638–47, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981)) (refusing to recognize implied or common-law right to contribution in the Sherman Act or the Clayton Act), and *Nw. Airlines, Inc. v. Transp. Workers Union,* 451 U.S. 77, 90–99, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) (refusing to recognize implied or common-law right to contribution in the Equal Pay Act of 1963 or Title VII of the Civil Rights Act of 1964).

*Consolidated Edison,* while not explicitly overruling *Bedford Affiliates, see id.* at 100–01, effectively made § 107(a) available for any PRP that has not been sued but that has voluntarily incurred cleanup costs. The *Consolidated Edison* panel noted:

> *Cooper Industries* may call into question the rationale of *Bedford Affiliates's* section 107(a) holding. Certainly, it no longer makes sense to argue that permitting a potentially responsible person to sue under section 107(a) would render section 113(f)(1)'s statute of limitations meaningless because a party proceeding in the absence of a civil action no longer has the option of suing under section 113(f)(1). *See Bedford Affiliates,* 156 F.3d at 424. Consequently, it might be argued that, in the wake of *Cooper Industries, Bedford Affiliates's* section 107(a) holding can no longer stand.

423 F.3d at 101 n. 12. The Court also pointed out that our case law suggests that there may be sound policy reasons in favor of revisiting *Bedford Affiliates* in light of *Cooper Industries.*

> [W]e believe we would be impermissibly discouraging voluntary cleanup were we to read section 107(a) to preclude parties that, if sued, would be held liable under section 107(a) [that is, PRPs] from recovering necessary response costs. Were this economic disincentive in place, such parties would likely wait until they are sued to commence cleaning up any site for which they are not exclusively

responsible because of their inability to be reimbursed for cleanup expenditures in the absence of a suit.

*Consol. Edison,* 423 F.3d at 100 (citing *Syms,* 408 F.3d at 106 n. 8 (observing that "the combination of *Cooper Industries* and *Bedford Affiliates* ... would create a perverse incentive for PRPs to wait until they are sued before incurring response costs")). *But cf. United Techs. Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 100 (1st Cir.1994) ("[I]t is sensible to assume that Congress intended only innocent parties—not parties who were themselves liable—to be permitted to recoup the whole of their expenditures.").

In *Consolidated Edison,* this Court recognized that allowing a cost recovery action under § 107(a) would allow complete indemnification for a party that may itself be potentially liable for a portion of the cleanup costs. We noted that "[s]ome might argue that a person who, if sued, would be partly liable for necessary costs of response may be unjustly enriched if allowed under section 107(a) to recover 100 percent of its costs from other persons." *Consol. Edison,* 423 F.3d at 100 n. 9. The Court concluded that this fear seemed "misplaced" because "there appears to be no bar precluding a person sued under section 107(a) from bringing a counterclaim under section 113(f)(1) for offsetting contribution against the plaintiff volunteer who, if sued, would be liable under section 107(a)." [16] *Id.*

---

**16.** In contrast, several courts of appeal, including our own, previously indicated, in cases decided *before Cooper Industries,* that a potentially responsible party cannot recover in indemnity. In *Bedford Affiliates,* for example, we held that "one potentially responsible person can never recover 100 percent of the response costs from others similarly situated since it is a joint tortfeasor—and not an innocent party—that ultimately must bear its *pro rata* share of cleanup costs under § 107(a)."

156 F.3d at 424. Each of our sister circuits that addressed this issue prior to *Cooper Industries* also held (or indicated) that PRPs are precluded from seeking joint and several cost recovery under § 107(a) and are limited to actions for contribution. *See United Techs. Corp. v. Browning–Ferris Indus. Inc.,* 33 F.3d 96, 101 (1st Cir.1994); *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1122 (3d Cir.1997); *Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.,* 142

Instead of overruling *Bedford Affiliates,* however, *Consolidated Edison* attempted to distinguish *Bedford Affiliates* by means of two "critical distinctions." 423 F.3d at 100. First, the *Consolidated Edison* Court noted that, "unlike in this case where there has been no adjudication of Con Ed's liability for response costs and no administrative or judicially approved settlement requiring Con Ed to incur those expenses, in *Bedford Affiliates,* the plaintiff had entered into two consent orders with the Department, pursuant to which the plaintiff began cleanup and remedial action." *Id.* at 101. Second, the Court noted that the *Bedford Affiliates* plaintiff, having agreed to the consent order, "put the extent of its liability at issue by proceeding to seek recovery under both sections 107(a) and 113(f)(1)" and that the district court in *Bedford Affiliates* had proceeded to find that "the plaintiff was partially liable for the costs of response."[17] *Id.* at 102. Applying these two factors in *Consolidated Edison,* the Court concluded that, "[h]ere, there have been no consent orders and no proceeding apportioning necessary costs of response to Con Ed, and these differences distinguish this case from *Bedford Affiliates.*" *Id.*

We conclude that, once again, we need not revisit the holding of *Bedford Affiliates. Consolidated Edison* is controlling on the question of whether Schaefer has a

cause of action under § 107(a). Schaefer, like the plaintiff in *Consolidated Edison,* is a PRP who has not been sued under either § 106 or § 107 but who seeks recovery of necessary response costs. As in *Consolidated Edison,* there has been no previous finding of partial liability under § 113(f)(1). That is, unlike in *Bedford Affiliates,* there is no danger here that "a party already adjudicated liable for a portion of the costs of response under section 113(f)(1) could circumvent that section by recovering under section 107(a) that portion of the costs attributed to it by the adjudication." *Consol. Edison,* 423 F.3d at 102.

Like the plaintiff in *Consolidated Edison,* Schaefer also initiated cleanup and remedial action voluntarily (i.e., not pursuant to a court or administrative order or judgment). However, as noted above, Schaefer, unlike the plaintiff in *Consolidated Edison,* did enter into two consent orders with the DEC: the 1990 Consent Order (which only required investigation of possible environmental threats posed by the landfill) and the 1992 Consent Order (which required closure of the landfill). *Consolidated Edison* used a seemingly similar fact in *Bedford Affiliates*—expenditures incurred under consent orders with the government—as one of the two "critical 17 distinctions" for distinguishing *Bedford.*[18] However, as discussed below,

F.3d 769, 776 (4th Cir.1998); *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir. 1989) (dictum); *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 350–51 (6th Cir.1998); *Akzo Coatings Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994); *Dico, Inc. v. Amoco Oil Co.,* 340 F.3d 525, 530–31 (8th Cir.2003); *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1301–03 (9th Cir.1997); *United States v. Colo. & E. R.R. Co.,* 50 F.3d 1530, 1536 (10th Cir.1995); *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996).

17. Of course, as we recognized in *Consolidated Edison, Cooper Industries* now forecloses

the possibility that a PRP who has not been sued under § 106 or § 107 can recover under § 113(f)(1). *See Consol. Edison,* 423 F.3d at 101 n. 12 *("Bedford Affiliates's* implicit holding that a plaintiff may proceed under section 113(f)(1) in the absence of a section 106 or 107(a) action has apparently been superseded by *Cooper Industries.")*.

18. This distinction is at least somewhat attenuated in light of *Consolidated Edison's* view that settlements of non-CERCLA liability (i.e., state liability) with state entities are not "set-

Schaefer began to incur 18 response costs *prior* to entering the 1992 Consent Order with the DEC. As a result, in contrast to *Bedford Affiliates*, where "Bedford agreed to *begin* cleanup procedures" pursuant to a consent order with the DEC, *see Bedford Affiliates*, 156 F.3d at 421 (emphasis add-

ed), Schaefer's response costs were not incurred "solely due to the imposition of liability through a final administrative order." *Consol. Edison*, 423 F.3d at 101. Thus, under the holding of this Court in *Consolidated Edison*, Schaefer may bring this action under § 107.[19]

tlements" for CERCLA purposes. *See Consol. Edison*, 423 F.3d at 95–96; *see also infra* note 19. Specifically, Schaefer could not be a party that has incurred expenditures under a consent order with a government agency as required by CERCLA because the *Consolidated Edison* court effectively held that such settlements do not count as administrative orders for purposes of CERCLA if they resolve non-CERCLA liability.

**19.** Victor contends that we should affirm the district court's alternative holding—that the three-year statute of limitations under CERCLA § 113(g)(3) began to run as a result of a judicially approved settlement, namely, the New York Supreme Court's 1994 Consent Judgment approving the 1992 Consent Order between Schaefer and the DEC. Victor presses that "CERCLA expressly permits settlements with State entities such as the DEC," *see* CERCLA 113(f)(3)(b), and that the costs associated with closing the landfill found in the 1992 Consent Order are the "exact costs" for which Schaefer now seeks to recover under CERCLA. Section 113(f)(3)(b) of CERCLA provides:

A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(3)(B). However, because we conclude that Schaefer may bring this claim under § 107(a), we need not decide whether the 1994 Consent Judgment constitutes a judicially approved settlement and, if so, whether the three-year statute of limitations under CERCLA § 113(g)(3) began to run at the time of this settlement.

We note, however, that if we were to address this issue, we would likely be bound by this Court's conclusion in *Consolidated Edison* that, when an administrative or judicially approved settlement is with a state entity and concerns only non-CERCLA liability, a party

may not bring a contribution action under § 113(f)(3)(B). *Consolidated Edison* interpreted § 113(f)(3)(B) to create a contribution right "only when liability for CERCLA claims, rather than some broader category of legal claims, is resolved." 423 F.3d at 95. Specifically, the Court concluded that "section 113(f)(3)(B) does not permit contribution actions based on the resolution of liability for state law—but not CERCLA—claims." *Id.* at 96. As a result, the Court held that Con Ed's Voluntary Cleanup Agreement with the DEC (which, according to the Court, only resolved liability for state law claims) did not qualify as an administrative or judicially approved settlement for purposes of § 113(f)(3)(B).

Similarly, in the instant case, Schaefer entered into the 1992 Consent Order with the DEC. The Consent Order does not mention CERCLA and reserved the State's right to bring a CERCLA action. The resolution of liability with a State for a clean-up under state law may, under certain circumstances, also resolve liability for response costs under CERCLA. Indeed, the statute seems to anticipate that possibility. *Compare Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F.Supp.2d 279, 286–87 (W.D.N.Y.2006) (holding that a party which entered into a consent order with the DEC could seek contribution under § 113(f)(3)(B) where the consent order expressly stated that the party had resolved its liability to the state for purposes of CERCLA), *with Niagara Mohawk Power Corp. v. Consol. Rail Corp.*, 436 F.Supp.2d 398, 401–02 (N.D.N.Y.2006) (holding that a party which entered into a consent order with the DEC could not seek contribution under § 113(f)(3)(B) where the administrative order did not resolve CERCLA liability and "there is no evidence, argument, or even allegation that federal authorities vested CERCLA authority in the DEC with regard to the agreement" (citing *Consol. Edison*, 423 F.3d at 96)). However, we need not address that possibility here. Because we conclude that Schaefer may bring this claim under § 107(a), the question of whether or not

## III. Statute of Limitations under CERCLA § 107

■ The law affecting Schaefer's claim has undergone an interesting journey. Although it is now clear that Schaefer does have a claim for remedial cost recovery under § 107(a), it is also clear from the record that Schaefer failed to file his CERCLA claim within the applicable statute of limitations. As both parties concede, Schaefer's actions were clearly remedial because they were part of a long-term, permanent containment effort, *see Shore Realty*, 759 F.2d at 1040, and were intended "to prevent or minimize the release of hazardous substances," CERCLA § 101(24). Therefore, the applicable statute of limitations for this cost recovery action under § 107(a) is "6 years after initiation of physical on-site construction of the remedial action." CERCLA § 113(g)(2)(B). The record indicates, however, that Schaefer initiated construction of a remedial nature more than six years before the commencement of this suit.

On appeal, Victor asserts that the district court correctly concluded that physical on-site construction of a remedial nature commenced in 1987 and was substantially completed in 1992. Schaefer contends that the district court erred and that Victor failed to establish any physical on-site construction of a remedial nature prior to January 13, 1993 (i.e., prior to six years before the initiation of this action). Schaefer presses that the six-year statute of limitations did not begin to run until either final approval of a remedial action plan or permanent closure of the landfill on April 30, 1993, and that therefore the instant suit, filed on January 13, 1999, is timely. In response, Victor argues that Schaefer im-

permissibly attempts to restrict CERCLA's definition of "initiation of physical on-site construction of the remedial action." Victor contends that "there is no bright-line rule that remedial activity only occurs after closure of a landfill and/or final approval of a permanent remedy plan."

The determinative question is whether any of Schaefer's actions before January 13, 1993 (six years before Schaefer initiated this recovery action) constitute the "initiation of physical on-site construction of the remedial action." CERCLA § 113(g)(2)(B). We hold that Schaefer's actions, coupled with Mr. Schaefer's deposition testimony, show that this action is untimely because Schaefer initiated "physical on-site construction" of a remedial nature prior to January 13, 1993.

First, Schaefer's purchase of a dragline crawler crane (a crane mounted on a treaded tractor used for excavating) from the Vilsmeire Auction in November 1990 was, in his own words, "equipment we had to purchase to—to start this closure." While the mere purchase of a crane does not constitute the initiation of physical on-site construction, Schaefer's subsequent use of the crane to spread cover (a mixture of topsoil, sand, and gravel) over his landfill satisfies each of the four statutory prerequisites. As Schaefer explained:

> It's a drag line [crane]. We were dragging material up from in the back—we had the material on site that was used, it was okayed, the material on site was okayed for closure, we had to submit samples. So we used different types of equipment to dig this.

The activity of "dragging material up from in the back" with a crane certainly consti-

Schaefer satisfied the applicable statute of limitations under § 107(a) resolves this case.

tutes a "physical" activity. Moreover, Schaefer twice mentioned that this activity occurred "on site." While the mere purchase of the crawler crane did not constitute "construction," using this equipment to dig, drag, and spread on-site soil and other material over the site as cover qualifies as "construction of the remedial action." Finally, Schaefer testified that his use of the dragline crane was necessary for "closure" of the landfill, an "action[ ] consistent with permanent remedy," CERCLA § 101(24), and thus qualifies as the initiation of remedial action.

Second, Schaefer's use of cover necessary for closure is itself the initiation of physical on-site construction of a remedial nature. CERCLA specifically contemplates that the use of cover is a "remedial action" for purposes of the statute. *See* CERCLA § 101(24). Schaefer, in explaining his use of cover, notes that he used equipment from the Genesee Dump Truck company in 1990 because "you have to prepare your site, see, with a foot of soil all over" before the closure process can occur. The material that Schaefer used for cover, as noted above, was material from his own landfill property. Indeed, in a cost estimate prepared in late 1992, Schaefer's own expert, Timothy C. Rock, indicated that Schaefer "completed the closure in a very frugal matter" because the estimated closure cost of $1.253 million "included topsoil, sand and gravel from Schaefer's own mine valued at about $535,000." Schaefer's spreading this cover on his site in preparation for closure also constitutes an "action[ ] consistent with permanent remedy,"

CERCLA § 101(24), and thus qualifies as the initiation of remedial action.

In fact, Schaefer's deposition indicates that between 1987 and 1992 many of Schaefer's actions at the landfill (some of which included "physical on-site construction") were part of a remedial action and were necessary preparations for closure. In addition to the examples enumerated above, Schaefer indicated that the $1,778,000 incurred for response costs between 1987 and 1992 were related to the closure of the landfill. At his deposition, Schaefer was asked: "And these costs, to your knowledge, relate to the closure of your landfill; is that right?" He responded: "Yes, they do, sir." Thus, these expenses were not merely the costs associated with the normal, day-to-day activities of an operating landfill; these expenses were specifically incurred in contemplation of, and were consistent with, the permanent remedy. Indeed, Schaefer further testified that between 1987 and 1992 there was "no difference" between running the landfill and preparing for closure.

Relying on *United States v. Findett Corp.*, 220 F.3d 842 (8th Cir.2000), Schaefer argues that because these actions were preparatory in nature, they do not trigger the start of the limitations period. We disagree. In *Findett Corp.*, the Eighth Circuit concluded that activities such as "evaluation, sampling, surveying and measuring" did not constitute the initiation of on-site construction because these activities did not constitute "construction." *Id.* at 848. By contrast, Schaefer's use of a crane to dig, drag and spread soil on-site clearly constitutes construction.[20]

**20.** Schaefer also cites *GenCorp, Inc. v. Olin, Corp.*, 390 F.3d 433 (6th Cir.2004), in support of his claim that certain preliminary measures, such as the spreading of soil, do not qualify as the initiation of remedial action. Schaefer's reliance on *GenCorp*, however, is misplaced because *GenCorp* is distinguish-

able. In *GenCorp*, the Sixth Circuit held that the limitations period did not begin to run on a party's contribution claim when the party changed the landfill's slope gradient and added topsoil and clay to prevent soil erosion. *Id.* at 443–44. In *GenCorp*, however, the topsoil and clay were an "interim measure" that

The conclusion that Schaefer's actions were performed in contemplation of closure—a fact that Schaefer repeatedly admits in his deposition—is also bolstered by the fact that the DEC directed Schaefer to close the landfill no later than October 31, 1986, and that Schaefer initially agreed to close it by November 1992 (see 1992 Consent Order) and then by December 1992 (see Order of Modification). Although the DEC repeatedly instructed Schaefer to close the landfill, Schaefer continued to operate the landfill without a permit. At the same time, however, Schaefer took steps in preparation for closure, including physical on-site construction, that were consistent with a permanent remedy. Later, at his deposition, Schaefer continually asserted that, during this time period, he was engaged in physical on-site construction consistent with a permanent remedy. Thus, by waiting to file suit until January 13, 1999, Schaefer failed to bring this action within six years after the "initiation of physical on-site construction of the remedi-al action" as required under CERCLA § 113(g)(2)(B).[21]

■ Schaefer contends, however, that the six-year statute of limitations did not begin to run until the final closure of the landfill, which Schaefer claims began on April 30, 1993. Schaefer asserts that "[t]his is the earliest date on which permanent Closure of the Landfill began, since it was being operated and was an active Landfill up to that point." Schaefer draws support for a bright-line rule from *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661 (9th Cir.2004), in which the Ninth Circuit held that, for purposes of commencing the limitations period, the initiation of physical on-site construction can only occur after the adoption of the final remedial action plan. *Id.* at 667. Schaefer asks that we adopt a bright-line rule providing that the initiation of physical on-site construction cannot occur until either after the approval of the final remedial action plan or after the closure of the landfill.

---

was "inconsistent with the federal EPA's remedial plan." *Id.* at 444. By contrast, Schaefer's remedial activities were not only "consistent with permanent remedy," CERCLA § 101(24), but also were not in any way inconsistent with the closure/post-closure plan. Indeed, as noted above, Schaefer's use of his own topsoil, sand, and gravel was included in his own cost estimate for closing the landfill.

For similar reasons, we give no weight to Judge Harvey's observations in the 1994 Consent Judgment that Schaefer's "[i]nstallation of the final cover was not commenced or finished on the specified dates and [that] the cover adopted by [Schaefer] was not part of the approved closure/post-closure plan." Judge Harvey's finding is not inconsistent with our analysis. Judge Harvey did not make any factual finding with regard to whether or not Schaefer's use of cover constituted a remedial action for purposes of CERCLA. Moreover, as explained below, "actions consistent with permanent remedy," CERCLA § 101(24), can be taken before ap-proval of the final remedial action plan and before permanent closure of the landfill.

21. Because we conclude that Schaefer's remedial cost recovery action is untimely, Schaefer's attempt to recover for a removal action, a claim which hinges on the timeliness of the remedial action, is barred as well. CERCLA § 113(g)(2)(B) provides that an initial cost recovery action under § 107 must be commenced "for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered *in the cost recovery action brought under this subparagraph.*" 42 U.S.C. § 9613(g)(2)(B) (emphasis added). Under the plain language of the statute, because the "cost recovery action brought under this subparagraph" is untimely, Schaefer cannot maintain a corresponding action for removal.

In *Neville Chemical*, California brought suit on behalf of the California Department of Toxic Substances Control, seeking to recover response costs under § 107 for a remedial action. *See id.* The action at issue involved a groundwater and treatment system, including three extraction wells, that was "originally designed as an interim removal action" but remained part of the final remedial action plan. *Id.* at 665. Neville argued that the action was untimely because the statute of limitations began to run more than six years prior to the initiation of the suit when it began excavating the extraction wells. *See id.* at 666. California contended that no remedial action could have occurred until the Department had approved the final remedial action plan. *See id.*

In holding that California's action was timely, the Ninth Circuit reasoned: "The first point at which both parties can be certain any construction is consistent with a permanent remedy is when the permanent remedy is actually selected. In this case, as in most cases, the permanent remedy was selected when the final [remedial action plan] was approved." *Id.* at 667. The court concluded that "[t]he plain meaning of the definition of 'remedial,' read together with the statute of limitations in § 9613(g)(2) and the use of that same term in the rest of the statute, supports the conclusion that 'the initiation of physical on-site construction of the remedial action' can only occur after the final remedial action plan is adopted." [22] *Id.* at 667. The Ninth Circuit's bright-line rule postulates that approval of a final remedial action plan is the *sine qua non* for the initiation of remedial action. [23]

**22.** In *Neville Chemical*, the Ninth Circuit distinguished between a "remedial action plan"—what the court viewed as a bright line—and a "final remedial design." *Neville Chem. Co.*, 358 F.3d at 670; *see id.* at 670 n. 7 ("A remedial design is a term of art in CERCLA, and differs both substantively and temporally from a final remedial action plan."). The court admitted that "there is no explicit definition of 'remedial action plan' in either the statute or the regulations implementing it." *Id.* In distinguishing a remedial action plan from a remedial design, however, the Court noted:

The remedy chosen in the remedial action plan is only generally described in that document, leaving for a subsequent date the actual design of the plan's physical implementation.

The final remedial design, on the other hand, while based on the remedy adopted in the [remedial action plan], is distinct: it is "the technical analysis and procedures which follow the selection of remedy for a site and result in a detailed set of plans and specifications for implementation of the remedial action."

*Id.* (quoting 40 C.F.R. § 300.5) (citations omitted). The Ninth Circuit utilized the distinction between a remedial action plan and a final remedial design in distinguishing the Seventh Circuit's decision in *United States v.* *Navistar International Transportation Corp.*, 152 F.3d 702 (7th Cir.1998), which we discuss below. The Ninth Circuit reasoned that "[i]n *Navistar*, although the final remedial design was not approved until 1990, the final remedial action plan, selecting a permanent clay cap as part of the permanent remedy, was apparently approved before that." *Id.* at 670–71 (citing *Navistar*, 152 F.3d at 704) (footnote omitted). The Ninth Circuit concluded: "Because our holding finds the pivotal event for defining the initiation of remedial action is the adoption of a remedial action plan—not a final remedial design—the facts in Navistar would have led us to find the suit barred by the limitations period as well." *Id.* at 671.

**23.** The Ninth Circuit explicitly stated in *Neville Chemical* that it need not address the limitations period applicable to private suits not involving the government, like the cost recovery action brought by Schaefer, because "no non-governmental response cost suit is before us." *Neville Chem.*, 358 F.3d at 667 n. 3. In this regard, the court in *Neville* also asserted that "the statute of limitations is invoked to bar *the government* from collecting the costs it expended in cleaning up a hazardous waste site, a situation in which we have been specially instructed by the Supreme

We reject Schaefer's request that we adopt the Ninth Circuit's approach or a similar bright-line approach that physical on-site construction consistent with final remedy can only occur after the closure of the landfill. We do so for several reasons. Schaefer's contention is in tension with the plain language of the statute, which speaks of "actions *consistent with* permanent remedy" and nowhere mentions either approval of the final remedial action plan or closure of the landfill in connection with the statute of limitations. CERCLA § 101(24) (emphasis added); *cf. Neville Chem. Co.*, 358 F.3d at 670 n. 7 (noting that "there is no explicit definition of 'remedial action plan' in either the statute or the regulations implementing it"). Indeed, Schaefer's reasoning contradicts the decisions in several circuits that have concluded that CERCLA's statutory text does not support a bright-line rule for determining the initiation of remedial action. In discussing *Neville*, the Sixth Circuit noted that "other circuits have rejected this bright-line rule" and have "adhere[d] to the principle that for a 'remedial action' to begin, the work must be 'consistent with [the] permanent remedy.'" *GenCorp, Inc.*, 390 F.3d at 444 (citing *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917 (5th Cir.2000), and *Navistar Int'l Trans. Corp.*, 152 F.3d at 702) (second alteration in original).

In *United States v. Navistar International Transportation Corp.*, the Seventh Circuit rejected an argument that it should adopt a similar bright-line rule. 152 F.3d at 711–12. In *Navistar*, both the federal and state governments filed separate actions under CERCLA to recover costs that they had incurred in connection with the environmental clean-up and remediation of a landfill. *Id.* at 704. These costs were not covered by the governments' consent decree with a third party, which, "in combination with several administrative documents, established a timeline for the preparation and creation of the remedial design plan for the site and for the implementation of that plan." *Id.* Although the consent decree indicated that the implementation of the remedial action was to begin "after the final remedial design plans were approved by the EPA and the State," *id.*, the first lift of clay to build the permanent clay cap was placed on the landfill on September 18, 1990, two days before final approval of the design plan on September 20, 1990, *id.* at 705. The federal government filed its cost recovery suit on September 19, 1996, six years *less* one day after final approval of the design plan, but six years *plus* one day after the property owner began placing clay on the property. *See id.* at 711.

The Seventh Circuit concluded that the statute of limitations had run because "physical on-site construction" began with

Court to construe limitations periods in favor of the government." *Id.* at 666 (emphasis added) (citing *Badaracco v. Comm'r*, 464 U.S. 386, 391–92, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) ("Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.")). We note, however, that this principle of special deference to the government in construing a limitations period is usually invoked in cases involving rights vested in the government acting "in its sovereign capacity." *E.I. Dupont De Nemours & Co. v.*

*Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924); *see also United States v. Whited & Wheless*, 246 U.S. 552, 561, 38 S.Ct. 367, 62 L.Ed. 879 (1918) (explaining that this construction derives from the "'great principle of public policy' that the 'United States, asserting rights vested in them as a sovereign government, are not bound by any statute of limitations, unless Congress has clearly manifested its intention that they should be so bound'" (quoting *United States v. Nashville, Chattanooga & St. Louis Ry. Co.*, 118 U.S. 120, 125, 6 S.Ct. 1006, 30 L.Ed. 81 (1886))).

the construction of the clay caps rather than with the final approval of the design plan. *See id.* at 713. In rejecting a rule based on final approval of the remedial design, the Seventh Circuit pointed out:

> Whatever might be the advantages of such a[ ] [bright-line] approach, we are not persuaded that Congress intended such a rule. The statute is devoid of any reference that would lead us to conclude from its plain language that Congress intended to incorporate this specific aspect of the administrative process in establishing the actions that would trigger the limitations period. On the contrary, "remedial action" is a term broadly defined by the statute—a fact of which Congress was no doubt well aware when it incorporated that term in the statute of limitations. If it had intended to require that the EPA issue its final approval of the remedial design in order for a "remedial action" to begin within the meaning of § 9613(g)(2)(B)—a contention unsupported by the definition of "remedial action"—Congress surely would have provided us with a more explicit direction to that effect. Rather, in crafting the statute of limitations, Congress specifically made "the initiation of physical on-site construction of the remedial action" the triggering event.

*Navistar Int'l Transp. Corp.,* 152 F.3d at 712 (citations omitted). The reasoning underlying *Navistar's* rejection of a bright-line rule based on the final approval of the remedial design applies with equal force when considering Schaefer's attempt to establish a bright-line rule based on either the approval of the final remedial action plan or the closure of the landfill. Either of Schaefer's proposals would date the limitations period from an event that the statute does not employ in calibrating the applicable limitations period. As Victor points out, if Schaefer's approach were embraced, "the lengthy statutory definitions in CERCLA of removal and remedial action would be rendered meaningless, and the terms would simply be defined 'as all response activities which occur after final approval of the permanent plan' " or, alternatively, all response activities which occur after closure of the landfill. Appellee Br. at 28–29 (quoting *State of Cal. ex rel. California Dep't of Toxic Substances Control v. Hyampom Lumber Co.,* 903 F.Supp. 1389, 1393 (E.D.Cal.1995)). Schaefer's proposed rules may be bright lines, but each suffers from a total disregard of the plain language of the statute.[24]

24. Schaefer argued in her supplemental brief to the magistrate (although not in either of her briefs on appeal) that, earlier in this case, Victor stipulated to the fact that Schaefer began closure of the landfill only after April 30, 1993. As an initial matter, Schaefer no longer presses this argument based on Victor's purported stipulation. " 'It is well established that an argument not raised on appeal is deemed abandoned and lost, and that a court of appeals will not consider the argument unless it has reason to believe that manifest injustice would result otherwise.' " *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004) (quoting *United States v. Joyner,* 313 F.3d 40, 44 (2d Cir.2002)). Because we have no reason to believe that manifest injustice would result from our refusing to consider this argument, Schaefer has waived this argument on appeal.

Even assuming, however, that Schaefer had not waived the argument and assuming that we also concluded that Victor did concede that "closure" of the landfill did not begin until on or after April 30, 1993, that concession is different from a concession that Schaefer took no remedial action before April 30, 1993. Remedial action may (and, in this case, did) occur before the approval of the final remedial action plan or permanent closure of the landfill. Victor's purported concession likely would be determinative only if we adopted Schaefer's theory that no remedial action is possible before the final closure of a landfill. However, as discussed above, such an interpretation has no basis in the statute;

Schaefer's proposed rule is untenable for yet another reason: the rule would allow the commencement of the statute of limitations to become a discretionary determination. Were we to adopt the approval of the final remedial action plan as the point from which physical on-site construction would be measured, the commencement of the statute of limitations would be a discretionary decision for the party responsible for approving the remedial action plan. For example, in situations involving government actions to recoup response costs under CERCLA, *see, e.g., Neville Chem. Co.*, 358 F.3d at 666, such a rule would give government entities almost unlimited discretion as to when, or even whether, the limitations period begins to run. Accordingly, the value of the clarity and predictability of such a rule could be obscured by the inequity of intentional or negligent adjournment of the initiation of the limitations period by delay of approval of the final remedial action plan.

Likewise, in suits in which the party seeking to recover response costs is a PRP, such as Schaefer, rather than the government, a plaintiff could engage in strategic behavior to preclude the start of any limitations period. If remedial measures were taken before a remedial action plan had been finalized, an opportunistic plaintiff could prevent the commencement of the limitations period merely by preventing the approval of the final remedial action plan. Indeed, Schaefer's repeated attempts to operate the landfill without a permit and to seek modifications of the 1992 Consent Order, as well as his delay in submitting a closure/post-closure plan, could be viewed as exactly this type of conduct. Moreover, adopting the bright-line rule proposed by Schaefer might lead to the "awkward result that actions

brought by private parties to recover response costs would be subject to a different statute of limitations trigger when no government agency is involved in the clean-up." *Navistar*, 152 F.3d at 712 n. 17. We agree with the Seventh Circuit that "[w]e do not think Congress intended such an inconsistency when it drafted the statute of limitations provision." *Id.*

The same issues would arise were we to adopt the official closure of the landfill as the point from which we would measure whether on-site physical construction had occurred. A party could engage in significant construction consistent with a permanent remedy, such as beginning construction activities for the installation of a clay cap or spreading ground cover, while keeping the landfill nominally open. While the official closure of the landfill may, in many cases, coincide with initiation of physical on-site construction of the remedial action, this is not necessarily so. As discussed, it is clear in this case that Schaefer initiated on-site physical construction of the remedial action prior to the point at which the landfill was initially closed.

One of the primary functions of a limitations period, especially with regard to regulatory matters, is to ensure an intelligible record for our review. Statutes of limitations "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In the instant case, Schaefer engaged in physical on-site construction of a remedial nature more than a dozen years ago and more than six years before initiating this suit. But now, more than twenty

indeed, CERCLA nowhere mentions approval of a final "remedial action plan" or "closure"

as a triggering mechanism for the start of remedial action.

years after the DEC first directed closure of the landfill, Schaefer attempts to characterize these activities as actions not consistent with a permanent remedy. Allowing Schaefer to recharacterize his prior actions and extend the limitations period in this way would be to allow Schaefer to circumvent the very reasons for having a statute of limitations.

## IV. State Law Claims

 Schaefer also raises state law claims based on common law contribution, indemnification, and unjust enrichment. The district court, noting that "plaintiff's counsel agreed that [these] causes of actions were not viable claims," did not address these issues. On appeal, Schaefer did not brief, and thus has waived, his unjust enrichment claim. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir. 1998). Schaefer also appears to concede on appeal, as she did before the district court, that she no longer has a viable claim for contribution or indemnification against the *Village* of Victor. But Schaefer and the Town of Victor continue to dispute whether, earlier in this case, Schaefer also waived the claims for contribution and indemnification against the *Town of Victory,* and there appears to have been some confusion in that regard when the issue was before the district court. Upon our review of the transcript, it appears that Schaefer may not have waived her state law contribution and indemnification claims against the Town of Victor. We thus remand these claims to the district court for further consideration. Because we affirm the district court's dismissal of all of Schaefer's federal claims, on remand, the district court can exercise its discretion whether to invoke supplemental jurisdiction under 28 U.S.C. § 1367 over Schaefer's remaining state law claims. We note that, under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *see also Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 102–03 (2d Cir. 1998) (holding that the district court properly exercised its discretion in declining supplemental jurisdiction after dismissing the federal claims on summary judgment).

## CONCLUSION

Accordingly, we hold that Schaefer failed to initiate this CERCLA action within the applicable statute of limitations. While our holding in *Consolidated Edison* allows Schaefer to bring this claim as a cost recovery action under § 107(a), Schaefer failed to meet the six-year statute of limitations for remedial actions under § 113(g)(2). In so holding, we reject Schaefer's recommendation that we adopt a "bright-line" rule tied to the approval of a final remedial action plan or the permanent closure of the landfill. The limitations period for remedial actions begins six years from the "initiation of physical on-site construction of the remedial action." CERCLA § 113(g)(2)(B). Because Schaefer initiated physical on-site construction of a remedial action more than six years before the filing of this suit, Schaefer's CERCLA claim is untimely. Consequently, the decision of the district court is hereby AFFIRMED, except with regard to the district court's conclusion regarding plaintiff's remaining state law claims against the Town of Victor. As to these remaining state law claims against the Town of Victor, the decision of the district court is VACATED, and the case is REMANDED to the district court for further proceedings consistent with this opinion.