Norma **EVANS–GADSDEN,** Plaintiff,

v.

**BERNSTEIN LITOWITZ BERGER & GROSSMAN, LLP, and its named employees, Rochelle Feder Hansen, Esq., John Kehoe, Esq., and Eric Sandstedt, Esq., Defendants.**

**No. 04 CIV.1329 SCR.**

United States District Court, S.D. New York.

June 3, 2007.

Norma Evans Gadsden, Mount Vernon, NY, pro se.

John Patrick Keil, Collazo Carling & Mish LLP, New York, NY, for Defendant.

## DECISION AND ORDER

ROBINSON, District Judge.

## I. Background

### A. Procedural History

Norma Evans Gadsden (the "Plaintiff") filed an Amended Complaint *pro se* on February 19, 2004 against the law firm of Bernstein Litowitz Berger & Grossman, LLP and three of its employees, alleging that she was subjected to racial discrimination, adverse working conditions, a hostile work environment, disparate treatment, various acts of sabotage, retaliation, and wrongful termination in connection with her employment as a legal secretary. Though Plaintiff failed to specify in her Amended Complaint the statutory bases for her lawsuit, this Court interprets her claims as arising out of two federal civil rights statutes -Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. It is also possible to read into Plaintiff's pleadings and motion papers an attempt to assert claims for relief arising out of the New York Human Rights Law and common law fraud.

In a Decision and Order dated August 6, 2004, this Court granted a motion to dismiss all claims against the three individually named employees, which left Bernstein Litowitz Berger & Grossman, LLP (the "Defendant" or the "Firm") as the only remaining Defendant in the action. *See Evans–Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 332 F.Supp.2d 592 (S.D.N.Y.2004). Further, in a Decision and Order dated September 6, 2005, this Court adopted a Report and Recommendation issued by Magistrate Judge Mark D. Fox which denied Plaintiff's motion for leave to file a second amended complaint.

Defendant has made a motion for summary judgment, arguing that Plaintiff failed to demonstrate a prima facie case of discrimination, retaliation, or hostile work environment, and that even if she had made such a showing, Defendant's reasons for terminating Plaintiff's employment were legitimate and non-discriminatory. Plaintiff made a cross-motion for summary judgment in which she asserted a claim for common law fraud that she did not raise in her Amended Complaint or at any other point during this lawsuit.[1] In its reply papers, Defendant added an argument that any fraud claims Plaintiff discussed in her cross-motion were untimely and irrelevant.

For the reasons discussed below, Defendant's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.

**B. Facts**

Plaintiff, an African–American woman, began work as a legal secretary at the Firm in August 1998, and during the course of her employment principally was assigned at various times to work for Seth R. Lesser ("Lesser"), a partner at the Firm, and Firm associates Louis Paul, Rochelle Feder Hansen ("Hansen"), and John Kehoe ("Kehoe"). Def. R. 56.1 St. at ¶¶ 1, 3, 5, 7. Performance evaluations of Plaintiff between 1998 and 2002 were thoroughly mixed. A number of the attorneys and other supervisory staff who reviewed Plaintiff's work criticized her sharply, describing her as "hostile," "confrontational," disrespectful, careless, and insufficiently attentive to detail, particularly during Plaintiff's early years at the Firm. Def. R. 56.1 St. at ¶¶ 9, 10, 13, 14, 20, 27. As time progressed within this period, more and more of the evaluations praised Plaintiff's efforts—she was described as hardworking, dependable, and "ruthlessly efficient." *See* Def. R. 56.1 St. at Exs. 8–11. Lesser, who called Plaintiff "one of the very best secretaries in the office" in 2001 and "a star secretary" in 2002, also was impressed that Plaintiff became the first secretary who was able to work cooperatively with and "handle" Hansen. *Id.; see also* Def. R. 56.1 St. at Ex. 15. Even as she received considerable praise, however, several colleagues included caveats about Plaintiff's attitude and her strained interpersonal relationships with other members of the Firm's staff. Def. R. 56.1 St. at ¶¶ 18, 22, 23, 24, 26.

Lesser left the Firm in December 2002, and in early 2003 Plaintiff principally was assigned to work for Hansen and Kehoe. Def. R. 56.1 St. at ¶¶ 6, 7. In the spring of 2003, the Firm announced that it would move its offices from the 33rd floor to the 38th floor of the same building; as part of that move, Plaintiff's desk was relocated so that she was in closer proximity to Hansen

---

**1.** Plaintiff did attempt to assert a fraud claim as part of her proposed second amended complaint, but that proposed claim was made pursuant to 29 C.F.R. § 453.12, whereas the fraud allegation in her cross-motion for summary judgment purportedly arises out of the crime/fraud exception to the attorney-client privilege.

and to Daniel Berger ("Berger"), a partner at the Firm. Def. R. 56.1 St. at ¶¶ 30, 35. Because of the physical distance between them during the time that the Firm was located on the 33rd floor, Hansen did not interact with Plaintiff every day and did not ask her to perform many routine administrative assignments. Def. R. 56.1 St. at ¶ 34. Hansen told Plaintiff that once the move was completed and Plaintiff was sitting closer to her office, Hansen would expect Plaintiff to perform additional secretarial tasks for her. Def. R. 56.1 St. at ¶ 35.

Plaintiff alleged that in March and April 2003, Berger made two comments related to the Firm's impending move and to the plan to relocate Plaintiff so that she would sit closer to Berger. According to Plaintiff, at some point in March 2003, Berger told her "you're in deep doo-doo when we go upstairs"; after speaking with Director of Human Resources Eugenie Principe ("Principe") about the comment, Plaintiff understood it to mean that Berger would require a certain level of quiet in his workspace. *See* Def. R. 56.1 St. at Ex. 1. Berger denied making any comment to that effect.[2] *See* Berger Aff. at ¶ 4–5. Plaintiff further alleged that she was told by a paralegal at the Firm, Dwayne Lunde ("Lunde"), that Lunde spoke to an attorney, Victoria Wilhelm ("Wilhelm"), who claimed that she heard Berger say at a lunch on April 25, 2003: "I can't wait until we move upstairs so when that when that [sic] Black Bitch Norma opens her mouth, I can come out of my office and tell her to shut the fuck up." *See* Amended Complaint at ¶ 12. Neither Plaintiff nor Lunde were present at the lunch during which the alleged comment was made. Berger categorically denied using any racial epithets

or making any other discriminatory comments regarding Plaintiff. *See* Berger Aff. at ¶ 6. Further, both Wilhelm and Lunde submitted affidavits in which they specifically denied that Berger made these alleged comments; Lunde's affidavit indicated that he did have a conversation with Plaintiff about this subject, but in his version of events, Berger's comments did not include any racial or inflammatory language. Def. R. 56.1 St. at Exs. 18, 19. Plaintiff has offered no additional evidence of the purported April 25, 2003 remark other than her recollection of Lunde's recitation of Wilhelm's version of what Berger allegedly said.

Shortly after her discussion with Lunde, Plaintiff went to speak with Principe to report the story she heard from Lunde. According to Plaintiff, she told Principe that Berger's April 25, 2003 comments included "degrading remarks." *See* Def. R. 56.1 St. at Ex. 1. Principe, in contrast, recalled that Plaintiff told her simply that Berger had said "I can't wait for the first time Norma gets noisy, so I can tell her to be quiet." *See* Def. R. 56.1 St. at ¶ 45. Plaintiff maintains that the Firm failed to follow its employee grievance/dispute resolution procedures following her meeting with Principe because Principe never documented her response to Plaintiff's concerns in a memorandum to Plaintiff, as required in step one of the Firm's grievance policy. *See* Def. R. 56.1 St. at Ex. 50. There is, however, no allegation that Plaintiff prepared a formal written grievance in accordance with step two of the policy. *See id.*

On July 2, 2003, Principe circulated an e-mail to attorneys at the Firm soliciting feedback on *any* member of the staff "in the hope of correcting poor performance in

2. When asked about this comment at her deposition, Plaintiff indicated that she did not believe that the "deep doo-doo" comment had

anything to do with her race. *See* Def. R. 56.1 St. at Ex. 4.

advance of final review time." Def. R. 56.1 St. at ¶¶ 62–63 and Ex. 17. According to Principe, only five staff members responded to her request, and all five responses contained criticism of Plaintiff. *See* Principe Aff. at ¶ 37; Def. R. 56.1 St. at Ex. 17. Principe received very negative feedback about the substance of Plaintiff's work, as well as her attitude, from Hansen and Kehoe, as well as attorneys Joe Fonti and Avi Josefson, and administrative supervisor Carol Chapman. *See* Def. R. 56.1 St. at Ex. 17. Hansen described Plaintiff as repeatedly inattentive to simple details, "difficult to communicate with," and "inappropriately proprietary over the work," and wrote that her attitude toward coworkers was "counterproductive;" Hansen cited various examples to demonstrate these critiques. *Id.* Kehoe wrote that he found it easier "to avoid [Plaintiff's] involvement in my work," and that paralegals he has worked with found Plaintiff to be "rude, abrasive and generally difficult to deal with in a work setting."[3] *Id.* He added that "the reluctance of others to involve [Plaintiff] is becoming a real and noticeable problem," and that Plaintiff is "frequently caustic and abrasive"; he also documented a variety of specific examples of Plaintiff's conduct to support his review. *Id.* Fonti called Plaintiff "perhaps the most difficult person I have ever had to work with" and stated that her "questionable" skills "combined with her difficult personality cause a tremendous amount of wasted time and energy." *Id.* Both Chapman and Josefson offered substantially similar evaluations.

On or about July 17, 2003, Plaintiff met with Principe to discuss Plaintiff's concern that Hansen was acting in an extremely critical and antagonistic manner towards her. Def. R. 56.1 St. at ¶ 52. During this meeting, Plaintiff indicated that she would not quit her job, and that if the Firm wanted her to leave it would have to fire her; Principe assured Plaintiff that no one was conspiring against her and that no one wanted to fire her. Def. R. 56.1 St. at ¶ 54 and Ex. 1; Principe Aff. at ¶ 28.

On July 31, 2003, Principe held a meeting with Plaintiff, Hansen, and Kehoe during which she advised Plaintiff of the litany of complaints made by Chapman and the four attorneys, and told Plaintiff that if these issues were not corrected, the Firm would terminate her employment. Def. R. 56.1 St. at ¶¶ 89–92 and Ex. 22, 24. Plaintiff denied responsibility for the alleged mistakes, but asked that she be given another chance to work with Hansen and Kehoe and to improve her performance. Def. R. 56.1 St. at ¶¶ 95–96 and Ex. 25. According to Plaintiff, one aspect of the Firm's discrimination against her was its decision not to reassign Plaintiff to work for different attorneys when it became clear that Hansen and Kehoe were dissatisfied with her work. *See* Amended Complaint at ¶ 12. Plaintiff alleged that during her time at the Firm, other secretaries, one of whom is of Indian descent and the remainder of whom are Caucasian, had been reassigned for various reasons. *Id.* The Firm's policy is to reassign secretaries not at their request, but because of attorney departures or because the secretary does not fit the needs of individual attorneys. Def. R. 56.1 St. at ¶ 156.

According to Plaintiff, between June and September 2003, Hansen, Kehoe and Eric Sandstedt ("Sandstedt") were involved in a campaign to "sabotage" a number of elec-

---

**3.** This observation is further supported by an April 25, 2003 e-mail from paralegal Judith Goldfien to Principe and Hansen, in which Goldfien stated that she would no longer work with Plaintiff, and that the stress on her from working with Plaintiff was "intense" and "unbearable." See Def. 56.1 St. at ¶¶ 80–81 and Ex. 21.

tronic files that Plaintiff worked on during that time period by accessing and repeatedly altering the formatting of the documents.[4] Def. R. 56.1 St. at ¶¶ 157, 161 and Exs. 35, 40, 46. The only alleged acts of sabotage by Kehoe and Sandstedt, however, occurred between August 1 and August 15, 2003. Def. R. 56.1 St. at ¶ 165 and Ex. 43. Plaintiff's evidence of this document sabotage consists of document history reports, produced in discovery, that purport to show that these files were accessed by the aforementioned attorneys either using their own passwords or, at times, using Plaintiff's password when Plaintiff was not present at the Firm's offices. *See, e.g.,* Pl. Aff. at Ex. 22. According to Plaintiff, she would be asked to enter revisions into documents where the formatting had been altered significantly since the last time Plaintiff had worked on the document. Plaintiff claims that this sabotage was designed to make her look incompetent, but she admitted that at no time did she report this alleged sabotage to Principe or anyone else at the Firm. *See* Def. R. 56.1 St. at Ex. 30.

On August 30, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"), and the Firm was notified of the charge on September 22, 2003.[5] *See* Def. R. 56.1 St. at Ex. 1. The EEOC charge contained allegations of racial discrimination and retaliation that were, in sum and substance, the same as those contained in this lawsuit. *Id.* On October 8, 2003, Plaintiff visited the hospital as a result of the anxiety and stress she was suffering at work. *See* Def. R. 56.1 St. at Ex. 46. Further, during the course of 2003, Plaintiff received fewer opportunities for overtime work in 2003 than she had in previous years.[6]

In October 2003, Principe began her annual practice of soliciting performance evaluations from the Firm's attorneys to serve as the basis of the Firm's annual review of secretaries and paralegals. Def. R. 56.1 St. at ¶ 100. In a nine-page memorandum dated October 30, 2003, Hansen made clear to Principe that she was "no longer willing or able to work with [Plaintiff]"—among other things, Hansen stated that Plaintiff "cannot be relied upon for the simplest of tasks," and that "deficiencies in [Plaintiff's] work product, her inability to communicate and her attitude created additional burdens and stress." Def.

---

4. Plaintiff has stated that the first act of document sabotage by Hansen took place on June 18, 2003. *See* Def. R. 56.1 St. at Ex. 1. From what this Court can understand from Plaintiff's submissions in this case, however, it appears as though most of the specific alleged acts of sabotage Plaintiff complains of took place in August 2003. *See* Amended Complaint at ¶¶ 8–10. Plaintiff testified at her deposition in this matter that the sabotage did not stop until September 22, 2003. *See* Def. R. 56.1 St. at Exs. 13, 29.

5. As Plaintiff pointed out, the EEOC determined on November 21, 2003 that it could not conclude based on its investigation that there had been a violation of Title VII. *See* Amended Complaint at ¶ 17.

6. Plaintiff goes to great and detailed lengths to prove that the Firm provided inaccurate responses to certain interrogatories in order to suggest that Plaintiff actually worked *more* overtime in 2003 than she did in 2002. This Court finds it unnecessary to conduct a detailed examination of the parties' respective calculations as to the exact number of overtime hours or to determine whether the Firm's interrogatory response was completely accurate. Given that the Firm's summary judgment reply memorandum does not specifically refute the underlying facts of Plaintiff's claim that she worked fewer overtime hours in 2003 (the memorandum only challenges the legal significance of this point), this Court will accept Plaintiff's general assertion as true at this stage because, as described below, this disputed fact is not a "material" fact for the purposes of summary judgment.

R. 56.1 St. at Ex. 26. Hansen documented at least 12 examples of Plaintiff's sub-par performance that occurred in the period between Hansen's interim performance evaluation and her end-of-year write-up. *Id.* In Kehoe's October 29, 2003 evaluation, he described Plaintiff's biggest weakness as "her inability to work cooperatively with other staff members, paralegals or attorneys" and formally requested that he be assigned a different secretary to assist him. *Id.* Principe's October 30, 2003 report indicated that she did not believe that Plaintiff's performance—"either relating to her work product or her demeanor"—had improved since her July interim review, and she recommended that Plaintiff be terminated.

On November 5, 2003, Principe and Edward Grossman, the Managing Director of the Firm, met with Plaintiff and informed her that her employment was being terminated based upon her interim and year-end reviews; Plaintiff was presented with a document detailing the reasons for the Firm's decision. Def. R. 56.1 St. at ¶ 136 and Ex. 27. At the time of her termination, Plaintiff did not receive any severance pay because she refused to sign a waiver of liability, as demanded by the Firm. According to Plaintiff, at least one other employee of the Firm did receive a severance payment upon her departure, but that employee did in fact sign a waiver releasing the Firm from any liability. *See* Pl. Aff. at Ex. 30. While the Firm made Plaintiff aware of her right to pay for continuing group health insurance through the Firm, it did not offer to allow Plaintiff to continue to receive health insurance coverage free of charge. *See* Def. R. 56 St. at Ex. 50; Pl. Aff. at ¶ 5 and Ex. 30. Plaintiff was eventually replaced at the Firm in February 2004 by another African–American female secretary. Def. R. 56 St. at ¶ 155. Plaintiff has held several short-term positions as a legal secretary since her

termination; she believes that the Firm is continuing to retaliate against her by "blackballing" her in the New York City legal community, though she admitted at her deposition that she has no proof of this. Pl. Aff. at ¶¶ 5–6; Def. R. 56 St. at ¶ 167 and Ex. 45.

## II. Analysis

### A. Standard of review

Under Federal Rule of Civil Procedure 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The burden of demonstrating that no material fact exists lies with the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

A court considering a motion for summary judgment must construe the evidence in the light most favorable to the non-moving party, drawing all inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003). Further, because Plaintiff here is proceeding *pro se,* this Court interprets her pleadings liberally "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). Rather than asking if "the evidence unmistakably fa-

vors one side or the other," a court must ask whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If so, the court may not grant a defendant's motion for summary judgment. Assessing the credibility of witnesses and choosing between conflicting versions of events are roles for the factfinder, not for the court on summary judgment. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996).

The non-moving party, however, must present sufficient evidence such that a jury could reasonably find in its favor—"the mere existence of a scintilla of evidence in support of the plaintiff's position" is not enough. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. "The non-moving party may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998).

### B. Claims for Employment Discrimination under Title VII

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.2000e–2(a)(1). Allegations of unlawful employment discrimination and/or retaliation are considered under the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff bears the minimal initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *See Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001). A plaintiff who is able to make out a prima

facie case creates a presumption of discrimination and shifts the burden of production to the defendant. The defendant must meet this burden by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *See Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir.2001).

If the defendant can present a non-discriminatory explanation, the presumption of discrimination drops out of the analysis and the burden of proof shifts back to the plaintiff. *Id.* The plaintiff must then prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir.2004). A plaintiff may satisfy his or her burden at the pretext stage by showing that similarly situated employees outside the protected class received more favorable treatment than the plaintiff did. *See Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000).

#### i. Racial discrimination / disparate treatment

■ To make out a prima facie discrimination claim, the Plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she is qualified for the position in question; (3) that she suffered an adverse employment action; and that (4) the circumstances surrounding the adverse action give rise to an inference of discrimination. *See Feingold*, 366 F.3d at 152.

There is no dispute that Plaintiff is a member of a protected class, and for the purposes of this motion, Defendant does not dispute that Plaintiff was qualified for the position in question. Plaintiff does not specify exactly which of the adverse employment actions she alleges are attributable to racial discrimination, but her termination clearly constitutes an adverse employment action that enables her to reach the fourth prong of the prima facie test. In addition, Plaintiff's allegations concerning the Firm's decision not to reassign her to work for different attorneys are tied to race in that she lists the race of other secretaries who were transferred. This Court will treat the Firm's decision not to reassign Plaintiff as an adverse employment action for the purposes of this analysis.[7]

### a. Termination

■ Plaintiff offers no admissible evidence to support the conclusion that the circumstances surrounding her termination give rise to an inference of discrimination. The record before this Court contains only one reference to an alleged remark that had any racial overtones—Berger's alleged comment at the April 25, 2003 lunch that was supposedly relayed to Plaintiff through Wilhelm and Lunde. Berger, Wilhelm, and Lunde all insist that no such racial remark was ever made, and Plaintiff can offer nothing other than her own self-serving testimony, based on hearsay, to support her position. Plaintiff's only evidence of racial discrimination is, at best, extremely tenuous, and even that extremely tenuous evidence could never be presented to a jury. It is also worth noting that the person hired to replace Plaintiff at the Firm was also an African–American woman. Given Plaintiff's total lack of support for the racial discrimination allegation, this Court concludes that she has failed to make even a prima facie showing of discrimination as to her termination.

[3] As this Court finds that Plaintiff did not establish a prima facie case for discrimination, it need not determine if Defendant offered a valid, nondiscriminatory reason for its actions. Nevertheless, as will be discussed in greater detail below, Defendant has articulated valid, nondiscriminatory reasons for terminating Plaintiff. Furthermore, Plaintiff has clearly not demonstrated that it was "more likely than not" that Defendant's justifications were mere pretext. *See Fisher v. Vassar College,* 114 F.3d 1332, 1337, 1342, 1346 (2d Cir.1997) (holding that if the plaintiff's evidence barely sufficed to establish a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale).

### b. Firm's decision not to reassign Plaintiff

■ Plaintiff's unrebutted testimony that other secretaries—one of Indian descent and the remainder Caucasian—were

---

7. In her papers, Plaintiff also suggests that the following actions may have been linked to racial discrimination: (1) the fact that Plaintiff was brought in for an interim performance review; (2) the alleged sabotage of Plaintiff's documents; (3) Defendant's purported failure to comply with its own grievance policy; and (4) Plaintiff's diminished overtime opportunities in 2003. As to these items, however, Plaintiff makes no specific showing of any racial component to the actions other than the one comment she attributes to Berger. As discussed below, that comment alone is not enough to sustain a prima facie case of discrimination for Plaintiff's termination; accordingly, it would not be enough to prove a prima facie case of discrimination for any of these other alleged adverse employment actions either. Thus, it is not necessary to discuss each of these items individually.

reassigned for various reasons to work for other attorneys while Plaintiff was never given an opportunity to work with attorneys other than Hansen and Kehoe could, under the required de minimis standard, be viewed as giving rise to an inference of discrimination. Defendant successfully counters that inference by describing its policy of reassignment—such changes are made not pursuant to the requests of the secretarial staff, but rather based on the needs of the Firm as a whole. Thus, Plaintiff cannot, and in fact does not, claim that she was denied an accommodation that others were granted upon their request. Further, Plaintiff makes no effort whatsoever to demonstrate that the other secretaries in question were similarly situated to her; indeed, there is nothing in the record to suggest that any of the secretaries who were reassigned had anything approaching Plaintiff's record of difficulty interacting with fellow employees or complaints about work product. In short, Defendant offers a legitimate, non-discriminatory basis for its decision not to reassign Plaintiff to work for other attorneys at the Firm, and Plaintiff offers nothing that would permit a rational factfinder to conclude that Defendant's decision was based in any part on discrimination.

For all of these reasons, Defendant's motion for summary judgment on Plaintiff's racial discrimination claims is granted.

### ii. Retaliation

■ To establish a prima facie case of retaliation, a plaintiff must show that "(1) [he or] she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir.2001).

■ As to the "protected activity" element of a Title VII retaliation claim, the Plaintiff need only have a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII, and may state a prima facie case for retaliation even when her primary claim for discrimination is insufficient to survive summary judgment. *See McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir.2001); *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 135 (2d Cir.1999).

■ An "adverse employment action" must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices...unique to a particular situation." *Feingold*, 366 F.3d at 152.

■ A plaintiff can show a sufficient causal connection between the protected activity and the adverse employment action through evidence of retaliatory animus directed against the plaintiff by defendant. *Raniola*, 243 F.3d at 625. Such a connection can also be established indirectly by "showing that the protected activity was closely followed in time by the adverse [employment] action." *Gorman–Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir.2001). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal

relationship" between the protected activity and an allegedly retaliatory action. *Id.*

Viewing the facts in the light most favorable to Plaintiff here, Plaintiff engaged in protected activity on two occasions—first, when she reported Berger's racial remark to Principe in late April 2003, and second when she filed her charge of discrimination with the EEOC in late August 2003. In each instance, Defendant was aware of the purported protected activity—in the first instance, the complaint was made to Defendant's Director of Human Resources [8], and in the second, the Firm received notice of the EEOC charge on September 22, 2003. Thus, Plaintiff easily establishes the first two prongs of the prima facie test for retaliation.

Though Plaintiff does not specifically allege which purportedly adverse employment actions constituted retaliatory behavior by the Firm, this Court can make out seven possible claims of retaliatory action: (a) the Firm's July 2003 interim review of Plaintiff; (b) Plaintiff's termination; (c) the Firm's refusal to pay Plaintiff severance or to allow her to continue medial coverage free of charge; (d) the Firm's alleged interference with Plaintiff's efforts to obtain employment; (e) the Firm's decision not to reassign Plaintiff to work for other attorneys; (f) Plaintiff's decreased overtime opportunities in 2003; and (g) the alleged sabotage of Plaintiff's documents. For the reasons explained below, Defendant's motion for summary judgment as to Plaintiff's retaliation claims is granted for each and every possible retaliatory action.

### a. July 2003 interim review

█ Plaintiff has not offered any evidence to support a prima facie case of retaliatory animus for the Firm's July 2003 interim performance review of Plaintiff. On July 2, 2003, and then again on July 16, Principe circulated an e-mail to all attorneys in the Firm's New York office asking for feedback regarding any problems the attorneys had experienced with "any staff member" during 2003. *See* Def. R. 56.1 St. at Ex. 17. While she acknowledged that this was a new procedure for the human resources department, Principe did not mention any single employee by name, nor did she target the e-mail to particular attorneys who had worked only with certain staff members. Several employees were mentioned in the responses Principe received, but Plaintiff was the only individual mentioned in each of the responses. Based upon these responses, Principe met with Plaintiff on July 31 to outline the concerns that had been raised, to give her an opportunity to correct those issues, and to warn her that if she did not improve her performance and her attitude, she would face termination. Not only does this review not constitute an adverse employment action, but Plaintiff certainly has not shown a causal link between the review and any protected activity. There is certainly no direct evidence of retaliation—it is clear from Principe's e-mail that she was soliciting feedback about any and all staff members as part of the interim review process. Further, there is no indirect evidence of retaliation here based on the timing of the interim review—the only possible protected activity that could have spurred the interim review process took place in late April 2003, more than three months before Principe's interim review meeting with Plaintiff. The temporal connection is too tenuous here to support a prima facie claim of retaliation regarding the interim review.

---

**8.** Defendant disputes Plaintiff's representation that she reported a racially offensive remark to Principe at their April 2003 meeting, but for the purposes of this motion, this Court must view this disputed fact in the light most favorable to the Plaintiff.

### b. Termination

██ Plaintiff was terminated on November 5, 2003, just over two months after she filed her charge of discrimination with the EEOC, and approximately six weeks after Defendant received notice of that charge. Though Plaintiff offers no direct evidence of retaliatory animus to link her EEOC charge to her termination, the timing of her termination alone is sufficient to give rise to an inference of retaliatory animus that shifts the burden to Defendant. Defendant, however, has provided ample evidence of non-retaliatory motive for its actions. Beginning with the interim review process in July 2003, Plaintiff received uniformly negative feedback concerning her work performance and her attitude from the attorneys she worked with most closely, as well as other attorneys and Firm personnel. Plaintiff met with Hansen, Kehoe, and Principe to discuss her performance, and she was specifically warned that if her overall conduct did not improve in the months ahead, the Firm would be forced to terminate her. This warning was issued nearly two months before Defendant received formal notice of the EEOC charge. Nevertheless, when the Firm began its year-end review process in October 2003, the reviews of Plaintiff's work remained uniformly negative, and Hansen and Kehoe provided numerous examples of Plaintiff's continued poor performance and attitude since the interim review.[9] Plaintiff offers no rebuttal to the thoroughly documented, non-discriminatory, and non-retaliatory justifications for her termination, and as such does not provide any evidence with which a rational factfinder could support a conclusion that her termination was a form of retaliation.

### c. Refusal to pay severance / provide free medical coverage

██ Just as the timing of her termination was in itself sufficient to give rise to an inference of retaliatory animus that shifted the burden to Defendant, so too is the Firm's contemporaneous decision not to offer Plaintiff severance.[10] Once again, however, the Firm has offered a valid, non-retaliatory explanation for its refusal to pay any severance to Plaintiff—specifically, Plaintiff refused to sign a release absolving the Firm of any potential liability in connection with her termination. Plaintiff pointed out that at least one other former employee of the Firm did in fact receive a severance payment, but testimony showed that she also met the Firm's condition for severance by signing a release of liability. Of course, Plaintiff was well within her rights to refuse to sign such a waiver, but the Firm was also within its rights to ask for one. Defendant's actions here cannot be considered retaliatory simply because it required a release as a precondition for severance. *See Cronin v. ITT Corp.*, 737 F.Supp. 224, 231 (S.D.N.Y.1990).

### d. Interference with efforts to obtain employment

According to Plaintiff, the Firm has prevented her from finding work as a legal

---

**9.** It should be noted that the Firm began its year-end review process in October in 1999, 2000, 2001, and 2002 as well—thus, there can be no argument that the timing of the 2003 reviews was tied in any way to the timing of Plaintiff's EEOC charge.

**10.** Plaintiff does not dispute that the Firm offered to allow her to pay to continue her group medical coverage following her termination, as required by law. We will treat her claimed entitlement to *free* continuing medical coverage as identical to her claim regarding severance, as there is no independent legally cognizable right to such free medical coverage.

secretary since her termination. This Court has interpreted this allegation as falling within Plaintiff's claim of retaliatory behavior by the Firm. As she admitted in her deposition, however, Plaintiff has no proof of this charge, and she offers no evidence to support such a claim in her voluminous submissions to this Court. Thus, there is no basis to find that the Firm did in fact interfere with Plaintiff's efforts to secure a new job, let alone that it did so out of retaliatory animus. Plaintiff thus fails to establish a prima facie case for retaliation with respect to the Firm's purported interference with her efforts to obtain employment.

### e. Firm's decision not to reassign Plaintiff

Even assuming *arguendo* that Plaintiff can establish a prima facie case of retaliation for the Firm's decision not to reassign her to work for other attorneys, it is clear, as explained in section II(B)(i)(b) above, that Defendant offered a sufficient non-retaliatory basis for its decision, and that Plaintiff failed to rebut that legitimate explanation. Just as this decision could not be attributed to racial discrimination, it cannot be attributed to retaliatory animus.

### f. Plaintiff's decreased overtime opportunities

▮ Plaintiff still cannot make out a prima facie case that her decreased overtime earnings in 2003 had anything to do with retaliation by the Firm. Significantly, the only data compiled by Plaintiff (or, for that matter, by the Firm in response to Plaintiff's interrogatories) in connection with overtime hours compares her overtime hours from year to year. By Plaintiff's own account, the first instance of protected activity for the purposes of a retaliation claim came in April 2003; thus, in order to determine whether there was a change in overtime hours in response to this protected activity, Plaintiff would have to submit data to show that there was a materially adverse change in her overtime hours subsequent to that late April meeting with Principe. There is no such data in the record here. Further, based on Plaintiff's own calculations, she worked an average of 21.5 overtime hours per month in 2002, and an average of 19.5 overtime hours per month (for the 10 months during which she was employed by the Firm) in 2003. Such a small fluctuation is hardly sufficient to make a showing of an adverse employment action. Even if it were, Defendant's ample evidence of Plaintiff's subpar performance and her difficulty working with many members of the Firm's staff provide more than adequate non-retaliatory justification for a decline in her overtime opportunities. Thus, for various reasons, Plaintiff cannot establish a prima facie case of retaliation based on her overtime hours.

### g. Sabotage of Plaintiff's documents

▮ Plaintiff's allegation that her electronic documents were sabotaged by the attorneys for whom she worked does not constitute a materially adverse employment action for the purposes of a retaliation claim. Even taking Plaintiff's largely conclusory and speculative allegations about the purported sabotage as true, Plaintiff fails to demonstrate how the sabotage could be viewed as an adverse action. Her scathing performance evaluations did not make reference to any shortcomings in her work that could be traced to the alleged sabotage. Further, to the extent that the purported sabotage may have led her to receive greater criticism from her supervisors, such criticism does not constitute an adverse employment action. Plaintiff's principal argument concerning the sabotage seems to be that it contributed to a hostile work environment; that claim is

addressed below. As to her retaliation claim, the allegations of sabotage fail to state a prima facie case.

### iii. Hostile work environment

■■■■■ The Second Circuit has held that under a Title VII analysis, a hostile work environment is one form of disparate treatment on the basis of race, color, religion, sex, or national origin. *Raniola,* 243 F.3d at 617. To prevail on a claim for a hostile work environment, the Plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). In analyzing these claims, courts must consider the totality of the circumstances. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Among the factors considered by courts are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Id.* Among other things, evidence of workplace sabotage can be relevant to claims of a hostile work environment. *Raniola,* 243 F.3d at 619–20. Generally, "incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano,* 294 F.3d at 374 (*quoting Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997)). A hostile work environment cannot be proven merely by "generalized feelings of discomfort." *Williams v. County of Westchester,* 171 F.3d 98, 101–02 (2d Cir.1999).

■■■■ The record in this case does not come close to supporting Plaintiff's claim of a hostile work environment. As discussed above, the only alleged racially-motivated remark made at the Firm is the April 25, 2003 comment made by Berger; not only is there considerable uncertainty as to whether that comment was made at all, but more importantly, Plaintiff cannot offer any admissible evidence of the comment that could be presented to a jury. Further, even if Plaintiff could establish through admissible evidence that the comment was made, a single remark of this sort does not meet the threshold for a racially hostile work environment. In addition, though Plaintiff's relationship with Hansen clearly deteriorated over the course of 2003, Plaintiff made no claims that their difficulties were permeated by any sort of racially offensive language or behavior. Hansen criticized Plaintiff's work and her attitude, and repeatedly indicated that she could not work with Plaintiff for a variety of reasons; none of these complaints, however, ever referred to Plaintiff's race or even suggested that the demise of their working relationship was tied to Plaintiff's race in any way.

Finally, although workplace sabotage can be considered as part of a claim for hostile work environment, such sabotage would only be relevant to Plaintiff's claim here if the alleged sabotage were illustrative of a work environment permeated by offensive conduct connected to her race. Here, Plaintiff's conclusory and somewhat convoluted allegations of document sabotage by the attorneys she worked for, even viewed in the light most favorable to the Plaintiff, do not demonstrate that she experienced a hostile work environment within the meaning of Title VII. Nearly all of the evidence Plaintiff has submitted to support her claims of sabotage is speculative, and much of it is incoherent; most critically for the purposes of a hostile work environment claim, there is no suggestion whatsoever that the alleged sabotage was connected to Plaintiff's race, or that it was

part of a pervasive overall atmosphere of racial hostility at the Firm. At best, these incidents were episodic, and at most resulted in Plaintiff having to perform repetitive editing tasks; certainly these purported acts of sabotage did not contribute to an environment of discriminatory intimidation, ridicule, and insult. In sum, Plaintiff does not set forth evidence sufficient to support her claim of a hostile work environment; accordingly, Defendant's motion for summary judgment as to this claim is granted.

### C. Claim for Racial Discrimination under 42 U.S.C. § 1981

 Although it was initially established for Title VII claims, the *McDonnell Douglas* burden-shifting framework also applies to employment discrimination claims under 42 U.S.C. § 1981. *See Hudson v. International Business Machines Corp.*, 620 F.2d 351, 354 (2d Cir.1980). To establish the requisite prima facie case for a violation of 42 U.S.C. § 1981, a plaintiff must establish: (1) that she is a member of a racial minority; (2) that the Defendant intended to discriminate against Plaintiff on the basis of her race; and (3) that the Defendant discriminated in connection with one of the statute's enumerated activities. *See Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir.1999); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir.2004)

For the reasons set forth in sections (II)(B)(i) and (II)(B)(iii), *infra*, Plaintiff clearly has not met her burden of demonstrating that Defendant intended to discriminate against her on the basis of her race. Once again, there is far too little evidence in the record to suggest that racial animus was a part of any of Defendant's decisions regarding Plaintiff's employment, or that there was a racially hostile work environment at the Firm. It is

therefore unnecessary for this Court to analyze whether any of Plaintiff's claims here properly fall within the enumerated activities covered by 42 U.S.C. § 1981. Thus, to the extent that Plaintiff intended to raise a claim under 42 U.S.C. § 1981, Defendant's motion for summary judgment as to that claim is granted.

### D. Exercise of Supplemental Jurisdiction over State Law Claims

 In her cross-motion for summary judgment, Plaintiff raised for the first time a claim of fraud based on the crime/fraud exception to the attorney-client privilege. As a threshold matter, even if Plaintiff's fraud claim were read in such a way as to bring it within a proper private right of action, this Court would still not be in a position to rule on the merits of this claim. Even given the considerable leeway in pleadings afforded to *pro se* litigants, Plaintiff here cannot raise a new claim for the first time in a cross-motion for summary judgment. In this action, Plaintiff not only amended her complaint once, but also sought leave to file a second amended complaint that would have added several additional causes of action. It is clear, therefore, that this Plaintiff knows enough about the legal process to understand when and where new claims are properly raised. Even if she did not, this Court would not permit Plaintiff to make an end-run around the most basic pleading requirements, and accordingly will not analyze Plaintiff's claim of fraud based on the crime-fraud exception to the attorney-client privilege. Given that various allegations of fraud make up the entirety of Plaintiff's cross-motion for summary judgment, that cross-motion is denied.

As set forth above, this Court has granted summary judgment for Defendant on each of Plaintiff's cognizable federal causes of action. This Court declines to assert

supplemental jurisdiction over any remaining state law claims that could be interpreted as arising in Plaintiff's Amended Complaint, including any claims under the New York Human Rights Law. *See* 28 U.S.C. § 1367(c)(3) ("the district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction"); *Schaefer v. Town of Victor*, 457 F.3d 188, 210 (2d Cir.2006).

## III. Conclusion

For the reasons discussed above, Defendant's motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.

The Clerk of the Court is hereby directed to close this case.

IT IS SO ORDERED.